UNITED STATES *v.* SAMUEL DUNKEL & CO., INC. (No. 4505) [1]

UNITED STATES *v.* SAMUEL DUNKEL & CO., INC. (No. 4506)

---

[1] C. A. D. 317.

United States Court of Customs and Patent Appeals, July 3, 1945

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

Brooks & Brooks (*Frederick W. Brooks* of counsel) for appellee.

[Oral argument May 9, 1945, by Mr. Donohue and Mr. Frederick W. Brooks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

These are appeals, consolidated by stipulation, from two separate judgments of the United States Customs Court, First Division, on the same questions of law and fact. A decision was rendered in the first case, involving protest 101043–K/192, and the decision in the second case, protest 107820–K/5163, adopted the reasoning of the first. The cases were here argued as one appeal, and will be considered in a single opinion.

The question for determination is one of law, that is, whether the trial court erred in holding that a refund of 99 per centum of the duties paid on butter imported from Argentina in 56-pound boxes, packed by appellee in one-pound tins in the United States, and exported under customs supervision, should be made to appellee. Appellee claims that the butter so packed was "manufactured or produced" in the United States with the use of imported merchandise, in accordance with the provisions of section 313 (a) of the Tariff Act of 1930, reading as follows:

SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.— Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, except that such duties shall not be so refunded upon the exportation of flour or by-products produced from wheat imported after ninety days after the date of the enactment of this Act. Where two or more products result from the manipulation of imported merchandise, the drawback shall be distributed to the several products in accordance with their relative values at the time of separation.

Appellee complied with all customs regulations and requirements of law with respect to the identity and proof of exportation of the merchandise.

The imported merchandise is known in the trade as "bulk butter." It arrived in blocks of 56 pounds each, encased in boxes. After importation it was forced through a die and emerged therefrom in the form of rolls weighing four pounds each, which were then cut into four equal parts, and placed, with parchment paper on the ends, in cylindrical tins. The tins were then sealed and ready for shipment.

It appears that butter in small quantities, such as quarter- or half-pound, or pound, units, is known in the trade as "print butter," and the exported butter is so called. A certain amount of moisture is lost in forcing the butter through the die, but such loss is inconsequential. The record discloses that the butter was packed in tins particularly for export, because of the substantial nature of the container, which obviously would afford greater protection for the butter while in transit. The record shows a price differential of 10 cents per pound between bulk butter and butter in tins.

It appears that drawback had been allowed on the exportation of print butter made from imported bulk butter from March 30, 1933 (T. D. 46571 (a), 64 Treas. Dec. 149), until September 30, 1942, when the merchandise at bar was denied drawback pursuant to a decision of the Bureau of Customs. Effective May 5, 1943, the Commissioner of Customs revoked all authorizations under which drawback had been allowed on imported bulk butter when cut to smaller sizes, packed in tins, and exported. T. D. 50582, 78 Treas. Dec. 259. The trial court noted those regulations, together with T. D. 47069 (c), T. D. 47175 (b) and (c), and T. D. 47446 (a) and (b), which were cited by appellee, who likewise called the court's attention to other Treasury decisions relating to drawback on products such as Roquefort cheese imported in bulk and cut into individual portions, and soap imported in bars and exported in cakes, granulated, or powdered form. The latter decisions were cited by appellee for the purpose of establishing a long-continued administrative practice and thus indicating that the Treasury Department regarded such transformation in form as took place in the case of the involved merchandise as coming within the scope of the drawback statute.

The trial court pointed out that there was no published announcement with respect to print butter prior to 1933, but reasoned that there was a similarity in principle between the processes applied to the involved merchandise and the cheese, soap, and other products covered by the said Treasury decisions, some of which were dated as early as 1924, and held that it evidently was the settled practice of the Treasury Department to consider the transformation of imported bulk products into consumer packages as entitling them to drawback, and because of that reasoning, since the drawback statute of 1922 was reenacted in 1930 without change with respect to "manufacture" or "production," held that the doctrine of legislative approval of long-administrative practice is applicable here as it was in the case of *Joshua Hoyle & Sons, Ltd., Inc.* v. *United States*, 25 C. C. P. A. (Customs) 128, T. D. 49244.

The trial court quoted from the case of *Anheuser-Busch Brewing Association* v. *The United States*, 207 U. S. 556, holding that, under section 25 of the Tariff Act of 1890, in order to be a manufacture

"There must be a transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' * * *," and assumed that that case promulgated the law in the interpretation of the term "manufactured," but stated that it was "still confronted with the word 'produced'."

In interpreting the word "production" the trial court called to its aid an opinion of Attorney General Bonaparte dated September 19, 1908, 27 Op. A. G. 668. The Attorney General stated the obvious in pointing out that there could be but little difference in the meaning of the words "manufactured" and "produced," but since Congress had used the latter expression it was reasonable to suppose that it appeared in the statute to cover cases not falling within the strict and limited construction applied by the courts to the word "manufactured." The court then held that a substantial manufacturing effort was employed on the involved merchandise making it suitable for use in a particular manner and materially increasing its value, and that therefore the butter in tins was "produced" in conformity with the involved section.

The court mentioned the case of *Rolland Freres, Inc.* v. *United States*, 23 C. C. P. A. (Customs) 81, T. D. 47763, seemingly for the reason that there this court used certain language with respect to the word "produced."

In its brief here appellee stresses principally the doctrine of legislative approval of long-continued administrative practice as applicable for the reasons given by the trial court.

The question of manufacture under the authority of the *Anheuser-Busch* case, *supra*, is not before us for the reason that in the packing of the involved butter, no new or different article having a distinctive name, character, or use emerged. The article imported was butter, and the article exported was the same butter. It had merely been altered in form. Unquestionably it was dedicated to the usual butter uses. The fact that the print butter here involved sells for substantially more per pound than the bulk butter is immaterial. The difference in price is apparently due to the cost of labor expended upon the die-work and cans, and to a profit.

While there is close kinship between the manufacture of an article and the production of an article, it may well be that production is a more inclusive term. But giving the latter its broadest interpretation, what can be said was produced by appellee? It merely imported 56-pound cakes of butter and exported it in smaller units. Mere change of shape or form, as here, is not production.

The case of *Joshua Hoyle & Son, supra*, is relied upon by appellee to establish its contention that the doctrine of long-continued administrative practice applies here. It also cites the case of *United States* v. *Adolphe Schwob, Inc.*, 21 C. C. P. A. (Customs) 116, T. D. 46447.

The article involved in the *Joshua Hoyle* case, *supra,* consisted of certain exported bleached and mercerized cotton cloth. It had been imported in the "gray" state and then bleached, mercerized, and exported by appellant. In reversing the judgment of the trial court, which held that the bleaching and mercerizing processes were not sufficient to bring it within the purview of section 313 of the Tariff Act of 1922, it was pointed out that according to the record, cotton cloth in the gray state was not commercially suitable for manufacturing into articles, and before it could be so used it was necessary to subject it to further manufacturing processes. The court stated that the question as to whether or not the merchandise came within the principles announced in the cases of *Rolland Freres, Inc.* v. *United States, supra,* and *Howard Hardy & Co., Inc.* v. *United States,* 25 C. C. P. A. (Customs) 17, T. D. 48978, was not free from difficulty, but held that the doctrine of legislative approval of long-continued administrative practice was applicable for the reason that the administrative practice of drawback on the same kind of goods as was there involved had continued from 1915 through the several tariff acts including the Tariff Act of 1930.

Clearly that case was decided on an entirely different state of facts than those present in the instant case. Here there has been no proof of administrative practice with respect to drawback on butter prior to 1933.

The *Schwob* case, *supra,* involved the exportation of watches which had been assembled by appellee from watch cases and movements separately imported. In affirming the judgment of the trial court, holding that the importer was entitled to drawback under the same section as that involved here, it was held that the exportation came within the spirit and intent of the drawback statute. The court held that it was immaterial whether goods were imported for re-manufacture or sale in the matter of the allowance of drawback. In that case a new and different article was exported, namely, watches from imported watch movements and cases. We are unable to perceive in what manner the decision in the *Schwob* case supports appellee's contention.

Clearly there is no proof of legislative adoption of long-continued administrative practice insofar as butter is concerned with respect to the present issue. It is immaterial that drawback may have been granted by the Treasury Department on other commodities where they may have been merely changed in size or form.

In the case of *Rolland Freres, Inc.* v. *United States, supra,* section 313 of the Tariff Act of 1922, substantially the same as the section here involved, was construed. In that case ladies' plain unembroidered dresses were imported, duty paid. Subsequently they were embroidered by an embroidery company, redelivered to appellant, and

exported. Appellant claimed drawback of 99 per centum of the duties paid. Counsel for appellant argued in effect that any manufacturing effort expended upon the dresses was sufficient to comply with the provisions of the statute. This court in its decision stated that it was inclined to agree with appellant that by use of the then new language in connection with the word "produced," Congress intended to authorize drawback on certain articles that had not been "manufactured" in a technical sense, but it would not give the provision there involved a construction such as would warrant allowance of drawback on every imported article subsequently exported "merely because some manufacturing effort had been expended thereon."

In that case we held that the involved articles were neither manufactured nor produced with the use of the imported merchandise, and stated that the court would not lay down a rule with respect to the terms "manufactured" and "produced" other than that found in the cases discussed therein, and that it would be necessary for customs officials to consider each case on its merits for the reason that they must "stand on their own bottoms."

Comparing the facts in this case with those appearing in the *Rolland Freres* case, *supra*, it is clear that a much greater processing had been done on the dresses there than on the butter here. There the record showed the plain dresses to have been embroidered, some around the front and neck, some along the entire front of the dress, some down the front, and others around the entire sleeve from the shoulder down. Here the butter has not been changed at all; it has merely been placed in convenient containers.

For the reasons hereinbefore stated the judgments of the United States Customs Court are *reversed*.

BLAND, Judge, dissenting.

Most of the matter following was prepared with the view that it would be adopted by the court as the majority opinion. A majority of the court disagrees therewith, and with a few changes and some added matter, the original subject matter will be submitted as my dissent.

The Collector of Customs at the port of New York refused, in two instances, to allow drawback on butter imported under the Tariff Act of 1930 from Argentina under circumstances which will be more fully explained hereinafter.

The importer, appellee herein, filed protests against the said refusals of the collector, and the cases were tried in the First Division of the United States Customs Court. From its judgments sustaining appellee's protests, the Government has here appealed.

The question presented is one of law, particularly going to the construction of the language used by Congress in section 313 (a) of

said Tariff Act of 1930 relating to drawback and refunds. The provision reads:

SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of *articles manufactured or produced in the United States with the use of imported merchandise,* the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, except that such duties shall not be so refunded upon the exportation of flour or by-products produced from wheat imported after ninety days after the date of the enactment of this Act. Where two or more products result from the *manipulation* of imported merchandise, the drawback shall be distributed to the several products in accordance with their relative values at the time of separation. [Italics ours.]

The record shows that appellee is a corporation doing business in the State of New York, and that one branch of its business is concerned with the processing of imported bulk butter and the exportation thereof as print butter in such containers as go directly to the consumers. In the instant case, all the butter imported was in 56-pound boxes. In appellee's plant the butter was removed from the containers and put into machines where it was forced through a die under great pressure and came out in the form of a roll. The roll was subsequently cut into 1-pound quantities in such shape as to fit the cylindrical 1-pound tin cans in which it was sealed and shipped, in the present instance, to the Red Cross at Geneva, Switerzland, for the purpose of feeding war prisoners.

In processing the butter, as high as 1 per centum of liquid was drained off and lost. This liquid, according to the record, was excess moisture in which there were probably some casein, butter fat, and other butter ingredients. The trial court held that this loss of moisture was negligible, and we are not inclined to regard this subject matter as of much importance in the decision of the instant issue. Some of the butter from Argentina has excessive moisture, and certain shipments might be regarded as *unlawful* butter—containing too much moisture. If this character of butter were processed, there would be a greater loss in weight, since the machine through which it is processed would eliminate most of the undesired moisture. But if the butter did not contain more moisture than is allowed under the governmental regulations, the processing would remove but very little moisture or butter substances.

An illustrative exhibit was introduced in the case. It consists of a 1-pound tin can, but the closure for the bottom of the container is not in evidence. The testimony shows that when the butter is cut up in pound quantities, it is pressed down in the can, with parchment on top and bottom, and the can is sealed—whether hermetically or otherwise is not expressly disclosed, yet the top of the said illustrative exhibit is hermetically sealed. The record does show, however, that the butter is put in this kind of container in order that it may

resist deterioration from heat, dust, and other atmospheric conditions until it reaches its destination and is distributed; and that the cans are shipped in wooden boxes. The rims of the said exhibit would seem to suggest that the can was designed for being hermetically sealed. I think it is fair to infer from the record that the sealing of the cans in a canning machine probably involves a soldering operation, but this fact is not definitely disclosed in the testimony. However, in my view, this consideration is cumulative and is not a matter of controlling importance.

The record discloses that the labor performed by appellee in this country increased the value of the butter 10 cents per pound when butter was worth 40 cents per pound; and I think it may be reasonably concluded that the boxes of butter from Argentina, if shipped long distances and under the conditions of the shipment of the instant goods, would not have served the purposes that were served by the instant shipments.

The Government in this court, while disclaiming any purpose to argue that the terms "manufactured" and "produced" should be regarded as synonymous, in effect, takes that position, contending strenuously as it does that insufficient work was done on the butter in this country to make it respond to the term "manufactured or produced." In other words, the effect of its argument is that since Argentine butter came into this country and Argentine butter went out of this country, there was not sufficient processing here to bring about the transformation required to meet the terms of the statute.

The trial court stated that there was no decided case which attempted to interpret the language in controversy as being applicable or inapplicable to imported bulk merchandise which was repacked or repackaged into consumer proportions. However, it pointed out that there were a number of Treasury decisions involving the same question relating to Roquefort cheese, soap, and butter.

The case most in point is this court's decision in *Rolland Freres, Inc.* v. *United States*, 23 C. C. P. A. (Customs) 81, T. D. 47763, which involved ladies' plain unembroidered dresses, which were imported and duty paid thereon. They were subsequently embroidered to some extent, not clearly disclosed by the record, and shipped abroad, resulting in the claim of the importer for 99 per centum drawback. The question there, as here, was whether or not the merchandise had been "manufactured or produced" in the United States with the use of imported merchandise. We affirmed the action of the trial court in denying the drawback claim and pointed out that the word "produced" was intended by Congress to be broader in its application than the word "manufactured," and that articles might be produced in this country by processes which did not measure up to the definitions given by the courts for the word "manufactured." In that case, however,

there was a failure to disclose the amount of embroidery which had been done on the dresses, and it was also apparent that the dresses exported were only those which were left over and unsalable, and that the importer's drawback claim was based upon circumstances outside the purpose and spirit of the drawback law. The facts of record in that case clearly showed, as we there stated, that the exporter was not acting within the spirit of the act.

Attention is here called to the fact that in the said *Rolland Freres* case we quoted from and discussed the case of *Anheuser-Busch Brewing Ass'n* v. *United States*, 207 U. S. 556. The decision in that and other similar cases brought about much discussion of the drawback provision when the tariff act of 1909 was being considered. In the *Anheuser-Busch* case, which involved imported bottle corks used in exported bottled beer, the court held that the corks had been manufactured before they arrived here and that there was no manufacturing effort expended on the corks here.

The rulings of the Attorneys General and the Treasury Department covering a long period of time involved the controversial issue as to the right of drawback on exported flour which was the result of a mixture of imported and domestic flours. Nothing was done on the flour question in the way of specific legislation until section 313 of the Tariff Act of 1922 was enacted, when a provision was made specifically excepting from the drawback privileges a mixture of imported and domestic flours unless the mixture comprised not less than 30 per centum of domestic flour. In section 313 of the Tariff Act of 1930, flour and byproducts produced from imported wheat were excepted altogether. In other words, Congress saw fit specifically to except under the new language a mixture of two flours which involved no manufacturing operations. I think the doctrine of *expressio unius est exclusio alterius* is applicable. Congress must have concluded that under the changed language such a mixture of flour would, unless expressly excluded, be subject to the drawback provisions. Of course, the instant exportation is not a mixture, but the said action of Congress indicates that in expressly excluding a mixture, it recognized that the drawback provisions of the tariff acts of 1913, 1922, and 1930 had been broadened so as to include articles which had been denied drawback under the earlier statutes.

I have very carefully studied the legislative history of the drawback provision in an effort to ascertain what meaning the Congress intended the words "manufactured or produced" to connote. In the act of 1909 and in prior tariff acts, there had been provisions for payment of drawback under certain circumstances where imported goods were used in the production of materials which were subsequently exported. In 1909 the provision comparable to that under considertion here read as follows:

Sec. 25. That where imported materials on which duties have been paid are used *in the manufacture of articles manufactured or produced in the United States*, there shall be allowed on the exportation of such articles a drawback equal in amount to the duties paid on the materials used, less one per centum of such duties * * *. [Italics ours.]

In 1913 Congress changed the language, in respects with which we are presently concerned, to read as follows:

O. That upon the exportation of *articles manufactured or produced in the United States* by the use of imported merchandise or materials upon which customs duties have been paid, the full amount of such duties paid upon the quantity of materials used in the manufacture or production of the exported product shall be refunded as drawback, less 1 per centum of such duties * * * [Italics ours.]

Subsequently, in the acts of 1922 and 1930, substantially the same language as that of the act of 1913 above quoted was used.

There had been spirited litigation in the Federal courts resulting in confusion as to what were the rights of an importer of foreign merchandise which he subsequently exported. The purpose of the drawback law has been declared so frequently by Congress and the courts as to require no extended citation of authority of discussion here. It was the hope of Congress, as early as the McKinley Tariff Act of 1890, to provide a system whereby raw materials or articles which required further manipulation to make them salable in international commerce might be imported with the privilege of drawback so as to encourage American industry and provide work for American labor. In the 1913 act, Congress took out of the act of 1909 the words "in the manufacture of" and provided merely that the articles were to be either "manufactured or produced" in this country by the use of imported merchandise.

During the preparation of the 1909 act, the hearings, committee reports, etc., show that there was much uncertainty at that time as to just what meaning should be given to the term "in the manufacture of articles manufactured or produced in the United States" in making application of the drawback law. Attorney General Charles J. Bonaparte, on September 19, 1908, rendered an opinion, 27 Op. Attys. Gen. 68, at the request of the Secretary of the Treasury, in which he gave his views, after citing many authorities, as to the meaning that should be given to the terms as they then applied to prior acts. He pointed out that Congress had deliberately used the word "produced'' as distinguished from the word "manufactured" and that notwithstanding the fact that the act said "in the manufacture of articles," the word "produced" should be given effect by making it apply to articles which were not manufactured in the strict sense of the word. That opinion was dealing directly with the problem as to whether or not wheat flour blended in this country in part of imported flour was a proper subject matter for drawback. The Attorney General thought that it was. Honorable H. S. Boutell, a member of the Ways and Means

Committee, which was then preparing the tariff act of 1909, caused that opinion to be published in the tariff hearings, and it was before Congress when the act of 1909 was passed. See Tariff Hearings before the Committee on Ways and Means of the House of Representatives, H. Doc. No. 1505, 60th Cong., 2d Sess. (1908–1909) vol. VII, p. 7389. In that opinion I find the following:

It is also worthy of consideration that in every instance but one in this entire section the words "produced," "production," and "producer" are used in connection with the words "manufactured," "manufacture," and "manufacturer." The section thus begins: "Where imported materials on which duties have been paid are used in the manufacture of articles manufactured or produced," etc.; and the second proviso reads:

That the imported materials used in the manufacture or production of articles entitled to drawback * * * when exported shall * * * be identified * * * the facts of the manufacture or production * * * shall be determined, and the drawback due thereon shall be paid to the manufacturer, producer, or exporter, to the agent of either, or to the person to whom such manufacturer, producer, exporter, or agent shall, in writing, order such drawback paid.

Why this careful and repeated use of the idea of production in connection with that of manufacture? Was it intended as mere surplusage and to add nothing whatever to the meaning of the act? It can hardly be thought that such was the purpose of Congress. *But if it means anything at all, it must broaden the provisions of the act and make it include cases which would not be embraced in the word "manufacture."* The fourth definition of the word "produce," as given by Webster, and the only one that can be here applicable, is: "To give being and form to; to manufacture; to make." There can therefore be but little difference between the two words "produce" and "manufacture" as used in this provision, but under this definition the word "make" can very properly be substituted for the word "produce;" and since the technical meaning of the first part of the word "manufacture" has long since disappeared, the word "make" has substantially the same meaning as the word "manufacture," stripped of its strict legal interpretation; and *it is but reasonable to suppose that Congress intended that this drawback provision should apply to cases which might not fall within the strict and limited construction given to the word "manufacture" by the courts, and for this reason added the word "produce" or its proper derivative.* [Italics ours.]

It is interesting to note that when the McKinley tariff bill was being debated in 1890, and a proposed change in the drawback provision of previous acts was under consideration, William McKinley, Chairman of the House Ways and Means Committee in charge of the bill, pointed out that the proposed language was directed toward broadening the drawback provision so as to permit the importation of foreign materials which would be manufactured in this country, thus encouraging foreign commerce and domestic industry and labor. See Tariff Hearings, *supra*, page 7394. The language referred to was adopted in the McKinley Act, and it was that language which was construed in the *Anheuser-Busch* case, *supra*. So far as material here, it was identical with the language above quoted from section 25 of the 1909 act. It must be remembered, therefore, that Mr. McKinley's statement was directed to language which appeared in the McKinley Act and in subsequent acts up to the act of 1913, and that

in those prior provisions. the language differed from that now under consideration in respects hereinbefore pointed out. When the 1913 act was passed, Congress, as before stated, left out from the drawback provision the words "used in the manufacture of articles" and left remaining therein, "articles manufactured or produced in the United States." It seems clear that Congress, in the preparation of the 1913 act, was trying to liberalize and broaden the drawback provision.

The argument of the Government that Argentine butter came into this country and that Argentine butter went out is, under the circumstances of this case, I think, without merit. Regardless of the fact that the origin of the exported product was Argentina, the exported product differed greatly and in material respects from the imported one. Butter in bulk quantities, obviously unfit for the purposes of the sealed tins here involved, was so transformed and processed as to produce a new and valuable article of commerce. To hold that before the drawback provision could be applied there must be such a manufacturing effort expended as to change the butter into another substance would be to ignore the legislative history herein referred to and the plain wording of the act.

We are now called upon to determine whether or not the Argentine butter in 56-pound boxes, when manipulated in this country in the manner hereinbefore stated, has been *manufactured or produced* in this country with the use of imported merchandise. In determining this question, I think we should recall the purpose which the Congress wished to serve and give the language used a liberal construction to promote that purpose. It sought to provide domestic industry with better opportunities to go into the markets of the world, to encourage the investment of capital here in manufacturing plants and in shipping facilities, and to give employment to American labor. To that end it provided that if the exported goods were manufactured or produced here in accordance with the statute, the importer should have 99 per centum of his duties returned to him.

In the instance at bar, appellee, by its manipulation of the imported butter, has furthered the legislative purpose in enacting the drawback provision. Its activities fall squarely within the spirit of the drawback law, and I think that the exported material was "produced" in the sense in which that term is used in the statute, and that the trial court properly sustained appellee's protests. In arriving at this conclusion, I have given due weight to the fact that in section 313 (a), after having used the words "manufactured or produced," Congress refers to the "manipulation" of imported merchandise.

My views in this case should not be interpreted as sanctioning the view that the drawback provision applies to every kind of imported material which may be only slightly processed or manipulated.

There is no hard and fast rule which can be properly stated or applied. The facts of each case must be judged, and it is my view that in each instance one seeking drawback should bring himself within the letter and spirit of the law, as was intended by Congress. It follows that there should be a showing, in connection with each allowable drawback claim, of such a processing or manipulation of imported material as would result in a production, the handling of which encourages American labor and industry and promotes foreign commerce.

One of the main issues pressed before the trial court by the importer involves the question of long-continued administrative practice. The Government contends that long-continued administrative practice is a matter to be proved and that it may not be assumed from Treasury rulings and court decisions. The trial court held that while there was no administrative practice applying to butter, antedating the year 1933, there was such practice shown as applicable to the repacking of Roquefort cheese and soap; that the practice with reference to those articles evidently met with congressional approval; and that the law was equally applicable to the print-packing of butter, as in the instant case. Without minimizing the importance of this issue as presented here, I am of opinion that in view of my conclusion as to the construction to be given to the controverted language, it is unnecessary to make any holding with respect thereto.

This case is of most unusual importance. The holding of the majority, in my judgment, will destroy an industry like those which Congress, in enacting the drawback provision, intended to encourage. Moreover, it is apparent from the record that the conduct of the Government in connection with this whole subject matter and particularly with the importer here involved, has led the importer to take such steps that serious injury to it will inevitably result.

While we are not a court of equity, such considerations should not be entirely lost sight of. The importer in this case had a right to rely upon a continuation of the Government's expressed attitude, which enabled it to import and export butter without being required to pay a duty thereon. This butter did not compete with American butter. It did not form any part of our domestic commerce, and, in my judgment, it is unfair to require payment of duty, such as results from the holding of the majority.

For the reasons stated, the judgments of the United States Customs Court should be affirmed.

I am authorized to say that O'Connell, J., concurs in this dissent.